I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. We have three interesting cases, good lawyers, and Judge Harris and I are honored to be sitting with Judge Nachmanoff of the Eastern District of Virginia, who's with us to help us do our work. Well, he has a full-time job in Alexandria, and now he has to come down to Richmond to help us out. We appreciate it very much, sir. Thank you. I'm delighted to be here. In the first case, the United States v. Limbaugh, Ms. Harrell, good to have you with us. Thank you, Your Honor. Nice to see you again. Thank you, sir. Good morning, and may it please the Court. My name is Emily Harrell, and I'm here on behalf of Starsha Limbaugh. There are three issues in this case for the Court's determination today. The first is the Rogers error, which is present, and of course, if you decide in Ms. Limbaugh's favor on that, you don't have to reach the other two errors, which her case will go back for a full resentencing. The second issue regards the calculation of loss in this matter. It's our position that we believe this issue ultimately rises and falls on whether Campbell was decided before Moses, and that decision binds this Court as to whether Keyser v. Wilkie applies to a determination of issues in the guidelines. If that were the case, an analysis of the loss is not ambiguous, and therefore, looking into the commentary to define loss to include intended loss, and of course, the $500 per access device is not warranted. The third issue for this Court's determination is an issue regarding forfeiture, which the Court has decided in Ms. Limbaugh's favor. That issue is whether the Supreme Court's decision in 2017 in Honeycutt v. United States also applies to forfeiture sought through 981A1C, and we believe that that is the circumstance here. Both the second and third issues rise and fall under a plain error view, but we do believe that both of those issues can be resolved and should be resolved in Ms. Limbaugh's favor. Well, it would be unusual, right, to you're basically arguing that the guidelines on your second issue, that the guidelines commentary is invalid or at least shouldn't bind us, and there's no authority in our circuit saying that, and the Supreme Court hasn't said that, so it would be unusual to decide an issue like that in your favor on plain error review, wouldn't it? Well, I believe that the Campbell decision does assist us and does Well, it does, but you still have to reason out from Campbell, and I do have some concern that Campbell and Kaiser are going to be somewhat possibly destabilizing, and that it's asking a lot of district court judges to tell them literally every time now you apply guidelines commentary, the first thing you need to do is a national search to see if there's any case law out there, even if nobody has objected. I feel like district court judges probably need to be able to just apply the commentary unless someone tells them they shouldn't. Well, Your Honor, I think that Campbell certainly directs the district court judges to apply the analysis in Kaiser v. Wilkie, and I think it's fairly evident that that is possible for district court judges to do without another specific direction. In this case, the term loss, which is in the guideline itself, is under the analysis I presented in Ms. Limbaugh's genuinely ambiguous, so you don't have to go to the commentary to define it, to include intended loss. Is there any court in the country that has held, that has adopted that view? No. I think there are, I think it's the Third Circuit, or maybe the Sixth, that has perhaps, excuse me, I think it's the Sixth, that has pointed in that direction, saying that it sweeps more broadly. It's saying there's a question. Yes. But there's not another court that has held that directly. So, I believe it certainly is possible for this court to apply the analysis that Campbell requires in its alternate holding that you have to apply the analysis that Kaiser v. Wilkie requires. The forfeiture issue is certainly... Is there a question here about Moses versus Campbell? Not in my mind, Your Honor. Campbell was certainly decided and published first. Moses published two weeks later. I think the binding authority in this court is Campbell because it has an alternate holding versus just the dicta that the government has argued in its brief is the alternate holding. So, I believe Campbell binds this court and binds the analysis of what one would do with the term loss in 5B1.1. The Rogers error is interesting. I certainly believe that it is evident in this case that the judge did not apply and impose the conditions that are included in the written judgment in Ms. Limbaugh's presence. Again, if you decide that issue in her favor, you need not reach the other two issues because it would go back. So, how do you distinguish CISON, which I think was decided after Rogers, which also deals with the South Carolina case and seems to involve similar, one might say, bare-bones language in that there isn't a specific reference to the PSR, but the court found it was adequate? I distinguish, we distinguish it based on the fact there are a couple of different reasons. In CISON, the district judge imposed the mandatory and standard conditions and the court found that there was no other list of standard conditions to which the judge could have been referring other than the list that's contained in 5D1.C of the guidelines. The appellant in that case did not argue what we have argued in this case, which is the statute, of course, the statute itself does not contain a list of standard conditions but references the standard conditions saying you can impose any of the standard conditions in 3563B. So, a list of standard conditions exists in 3563D. So, there's almost competing places you could find a list of standard conditions. I'm sorry, which are the two different sets of standard conditions that the judge might have been referring to? It could have been the list that is contained in the guidelines. The pre-sentence report in this case did not use the language that says at the top of that list that says these are conditions that are imposed. I may have misunderstood something important about the case, so I want to give you a chance to clarify. There's the list in the guidelines and there's the list in the pre-sentence report and I thought those lists were the same. They certainly can be. In this case, are those two lists different? No. Okay. But the judge here said the standard conditions but did not say the standard conditions contained in... But what is... In some districts, this can get tricky because the district has adopted its own list of standard conditions that is different from the guidelines. Correct. Is there some possible standard list out there that this judge could have been referring to that is different from the list in the PSR and in the guidelines? Yes. The list is contained in 3563B because 3583B says a judge can impose any of the conditions listed in 3563B and that list of those standard discretionary conditions contains I want to say 13 or 14 conditions that are different than the list contained in the guideline list. And so, as shown in my 28J letter, response to the government's 28J letter, the judge in this case did say condition 11 protects the public and keeps the defendant from committing further crimes and protects the probation office. Number 11 in that list of 3563B is a condition that for all or part of the period of probation, and those are a list of probation things, but they can be adopted into 3583, requires that a probationer reside for all or part of the period of probation in a halfway house or BOP facility. Well, that certainly satisfies that requirement that that person commit no further crimes or protects the probation officer or whatever. So, you have a little bit of a conflict here whether that discretionary condition, which is contained in the statute, 3563B, is different than the guidelines. And in Sisson, the appellant did not make this argument, whereas Ms. Limbaugh has made that argument about the difference in those two lists and what the judge could have been referring to when he said the standard conditions. So, our position is that Sisson does not decide this case. So, I don't know whether you have any further questions about the forfeiture or the loss issue. I'm happy to answer any more questions or I'm happy to reserve the rest of my time. Up to you. I'm ready to sit down. Thank you very much. Thank you, Your Honor. Mr. Watkins? Good morning, Your Honors. My name is Bill Watkins from the District of South Carolina. I represent the United States in this case. Your Honors, if I could just take the issues in order, and since we were just talking about the alleged Rogers error, you know, I'd just point to the PSR in the record, page 204. Paragraph 125 states, in accordance with USSG 5D 1.3C, the following are standard conditions of supervision. It's listed in the PSR. Judge Herlong adopted the PSR. There were no objections other than a couple of enhancements that were fully argued. Ms. Limbaugh knows how to object to something and her lawyer did a good job arguing objections. And when he sentenced her, he said the standard conditions apply. As this court held in Sisson, there are no, there's no standing order with a separate set of conditions. These are the standard conditions from the guidelines that our district judges employ, and essentially he incorporated by reference, which Rogers and Singletary allow. Well, he incorporated by reference without using the words incorporate by reference. That is correct, Your Honor. He did not say incorporate by reference, but he did adopt the PSR. And I just don't think there's any dispute what the standard conditions were, especially when he goes over condition 11, which deals with being a CI, specifically references that. No question it comes from paragraph 125, which Ms. Limbaugh had, which she read, and she understood. I think this is sufficient. Again, in Sisson, mandatory and standard conditions apply. You will comply with the standard conditions. Effectively, the same thing. So the government does not believe that there is any Rogers error in this case. You think Sisson applies? Yes, sir. Sisson applies and controls. That's where you part ways with, or a place you part ways with Ms. Harrell. On that issue, absolutely, Your Honor. I think that's the case Your Honors look to. It's perfectly on point. Moving on to this loss issue, Your Honors. The government would ask the court to not accept these arguments that somehow Stinson is overruled and no good and we can't look at the commentary anymore in the guidelines. If that were the case, and I'm sure especially Judge Nightingale working in the trenches, as I do, who would know whether there's a correct calculation of the guidelines if we have to jettison the commentary, which is part of one of the first things a district judge must do is properly calculate the guidelines. The commentary is critical to the guidelines as 1B1.7, a guideline itself, indicated that it's necessary for interpretation to ensure that the courts do not err in applying those guidelines. Counsel, can I ask you a question? Assuming the issue is properly in front of us, even under Stinson, right, we only defer to commentary that is actually interpreting or explaining guideline text, right? Yes, ma'am. On the $500 per device, I just have trouble, explain to me how a valid interpretation of the word loss is $500. Yeah, I would not say that's an arbitrary figure, but it's a designated figure and Is it a definition of the word loss? I think it's a proper definition Am I going to look up loss and find the definition $500? No, Your Honor, but if you looked at the very first book of the guidelines ever published in 1987, in their application note for stolen credit cards, the loss will be not less than $100 per card. This has been part of federal sentencing and the very first guideline book since 1987. I totally understand all of that argument. I'm just, is the government's position that the word loss has been defined to mean $500, or does it not matter? Are you saying that the commentary can be valid even under Stinson or under Kaiser, even if it is not sort of an effort to define a term in the way we usually use that language? I think the commentary can be used to explain a guideline, as 1B1.7 indicates, and I don't think you can divorce the commentary from loss, and while this has, again, been part of the guidelines since 1987, this idea that you can have a designated amount for an access device has been part of federal sentencing for, what, 27 or more years. I just have one last, where does the $500 figure come from? Is that the, is that intended, is that the commission's sort of best estimate of the average amount of loss in these cases? Is that what it is, or where does it come from? The commission, they're supposed to be the experts who determine these things, look at all the pre-sentence reports and judgments. It comes from the commission. They were charged, and I believe the late 90s, by Congress with reevaluating telecommunications devices and access devices and inflation, they upped it from 100 to 500 and their best judgment there. You may not, this is a genuine question, I'm just sort of curious, their best judgment as to what? Like, is this sort of a, like an empirical estimate? Like, you, you know, every case is different, but when we look at all the PSRs around the country and average it out, it's usually around $500. Is that what they're doing, or is, or did they get to that number some other way? Yonah, I don't have a good answer for you there. I'm just curious. I would have to ask the commission on that. But, Yonah, this whole, with Kaiser versus Wilkie and Campbell, I have no problem with Campbell whatsoever insofar as it relates to, I think, applying Stinson. We don't have competing definitions between loss. Again, this concept of intended loss that my colleague says is an expansion, my goodness, Yonah, this has been, again, part of the guidelines, and at the time it was 2F. They've been merged, but 2F1.1, in the text of the guidelines at the time, it talked about the loss being the estimated, probable, or intended loss. Congress is well aware of intended loss. It obviously approved that concept in the text of the guidelines, again, way back in 1987. Certainly, as we've moved forward in time, the commission and all of us not thinking anything untoward was referring the text to the commentary, did so as 2F1.1 went away and all the fraud came into 2B1.1, which we're now so used to, and definitions were applied in there just as, again, in the old days, definitions were, we find, you know, this is rife with definitions back in 1987 explaining what minimal planning is and victims, etc. It's all baked in. It's all part of the case, and on plain error review, Your Honor, I would just encourage this court not to reach out and, again, throw our district courts into tumult about what's the starting point now. We can't look at the commentary, though, and intended loss has been part of the guidelines for so many years there. I don't think there's a conflict between Campbell and Moses. Again, as Judge Niemeyer did, I read the Campbell discourse on Kaiser v. Wilkie as unnecessary and, therefore, dicta. But, Your Honor, even if in future cases or in this case you disagree with my analysis, if we did have to go, as Justice Kagan talked about, to the toolkit of statutory construction, I would urge you not to stop at the dictionary and plain meaning. In the Campbell case, for example, one of the key things relied upon there were the canons of interpretation and expressio unis as a canon. Well, there's also a canon that, essentially, this court should not engage in a construction that would lead to an absurd or unreasonably harsh result. And, Your Honor, I'm afraid that's exactly what we lead to if we, in effect, accept the proffered interpretation by my friend, Ms. Harrell, and undermine the guidelines there. We can look at, essentially, the context, again, 1B1.7, which was presented to Congress in 87, and makes clear that the commentary is necessary for judges to look to in order to understand how to properly apply the guidelines. So, I just want to make sure I'm understanding your argument that assuming Campbell, before Moses, is controlling and Kaiser applies, you're saying if you look at the context, that's fine, like loss is somewhat ambiguous, and needing it to include intended loss would be a reasonable interpretation, particularly in light of the history of this guideline. Yes, ma'am. I don't want to put words in your mouth, but that's roughly your argument. No, that is exactly my argument, Your Honor. If we go to the toolkit, the canons of interpretation, we would come to an absurd result. You look at judicial interpretations, as Your Honors know, no court in the country has bought this idea that we have to, pages and pages defining what loss is, explaining credits against loss, etc., have to be jettisoned in favor of Miriam's College Dictionary. So, we have judicial interpretations. Congress's purpose for certainty in sentencing, Your Honors, to avoid disparities, if different circuits can't tell what's in the guidelines, can we look at the commentary? We're going to have that. And most importantly, Your Honors, I would point out Booker. The Supreme Court went to great lengths, though these guidelines are advisory now, to save the guidelines. Booker could have very well have come out, okay, these are not mandatory, time to disband the Sentencing Commission, we're going to have state court sentencing, essentially, again. But they didn't. They worked very hard to say, nope, they're advisory, we still need to have that starting point for the guidelines. And in light of, what do you want to call it? I guess the sort of absurd results in the parade of horribles, I'm somewhat skeptical. I mean, all we're talking about here, if your colleague is right, is this stuff just needs to move up over the line, put it in the guideline. No one is saying you can't have guidelines, they're just saying you can't do the work of the actual guidelines under the line in the commentary. It's a policy judgment. You like the number 500, that's fine, run it by Congress. Well, Congress was fine with an arbitrary figure, clearly of 100, because the first guideline book was presented to them and we've had a figure, however, that was calculated since then. So I would argue it has been run by Congress. I would also argue, as in Moses, as Judge Niemeyer pointed out, as a practical matter, the commission goes through a notice and comment period where parties have an opportunity to object, raise issues. What the commission does is not done in the dark. And also, Your Honor, this whole idea of Kaiser versus Wilkie and the policy debates in the Supreme Court and otherwise about the administrative state. The commission, while in Stenson we have language that the sentencing commission is akin to an executive agency. It's sort of like saying, well, oranges are akin to apples and so far they're fruit, but my goodness, we wouldn't substitute oranges for apples in an apple pie. That wouldn't be a good result. And I think that's the same thing we have here. This is not your typical agency. Typically in the administrative state we have quasi-judicial, quasi-legislative, quasi-executive functions. Yes, the commission does some rulemaking, but it's not even binding. It's advisory. If a district judge, if Judge Nackmahoff, for example, thinks that properly applying the guidelines runs up too high, so long as he explains his reason for departing downward, he can do so and this court will affirm him. The rules are... Let me interrupt. Yes, sir. Just for a moment. In this particular case, the record reflects that the actual average loss associated with credit cards was about $35. Is that right? Yes. And so what we have is commentary that the commission and we're not clear here on the record how they came up with the $500, whether it was through empirical research, looking at PSRs, whether it was through some other kind of fact collecting that came up with the $500, but we have potentially a sentence that's based not on the actual loss or even the loss that is associated with these credit cards but is potentially a much higher number. And so I'm a little curious about the notion of the absurd results. It seems like perhaps not being stuck with that $500 number might be a better way to capture the facts in the case. Your Honor, I hear exactly what you're saying, but I would just again say since 1987 a set figure, no matter what the actual loss is on credit cards has been applied. The commission, however they calculate that, and I apologize Judge Harris, I don't have the answer of how they did that, but they are the experts. For example, Your Honor see plenty of challenges to the child pornography guidelines. Why? Well, because it wasn't the experts at the commission who drafted the current version, but Congress even though that's the national legislature and their duly elected representatives. But the arguments put forward and accepted by many courts is yeah, it's much fairly easy to vary from those guidelines because Congress drafted them, not the experts. This is why, and I also tried to find the answer for how the commission got to this $500 number and I couldn't figure it out, so I'm not I don't mean to push you on that. But it does seem to me it would be if in fact the commission sort of got together and did a bunch of empirical research and figured out the average loss is $500. I mean I take your point that that's the sort of thing we would normally delegate to sort of agency experts. But if they got together and figured out like wow, these devices are really bad we want to deter people from using them so we're going to jack the number up to $500 that starts to seem like a real policy judgment that ought to be above the line and in the commentary and so I wish, I really am not faulting you, but this is why I'm really struggling again, assuming the issue is properly before us, with this question of where that number came from, like what kind of a judgment does it reflect by the commission? No, again, I don't have the answer, but with these credit cards, white plastic individuals can change those numbers on these cards and we never can be sure because it's so easy to code and decode was that the only account number on this card they used? What if the devices were gift cards and they had a particular value? So this is a $50 gift card but under the guidelines now, the loss is going to be $500. I guess I'm going back to Judge Nachmanoff's question. It doesn't seem absurd to me to think that the loss ought to be what is the face value of the gift card. I understand it might it's perhaps not the only answer, but it doesn't seem like an absurd answer. I think probably the best answer would be that a district judge taking that into account could vary downward, could properly calculate the guidelines so there's no procedural error with the $500 rule and he is at liberty or she is at liberty to grant a variance say, you know, these Ms. Limbaugh's cards really average to $35 a piece not $500. I am going to vary downward to take that into account because, Your Honor, I do understand where you're coming from on this issue with access devices I'm just afraid that that is part of a slippery slope. I know we all have to be careful with slippery slope arguments but we need this book and the integrity of it to do our jobs down below. If not it's going to be a lot of work for you folks up here as almost any case would be appealable who knows what the guidelines are. Perhaps a commission can address this later on and hear of arguments like this and fix some of these things. I would have expected you to emphasize more the plain error aspect of this because I am inclined to agree that if district courts have to deal with this even in the absence of an objection that is going to be a very difficult process. Correct, Your Honor, and as I pointed out in the brief, this error doesn't jump off the page. No court in the country has held this on intended loss. I believe we have one Sixth Circuit case that has taken the view on the access devices but again, we are under plain error here and I see my time has expired though I'd be happy to answer any more questions that Your Honors have of me. Talk about that forfeiture issue for a minute. Yes, Your Honor, I agree with Ms. Harrell that that needs to go back. I don't know what you say on the record. I'm saying it, sir. What about the Honeycutt case? Was it decided here? Your Honor, the Solicitor's General's Office and I believe it's Pythamon essentially as Justice Sotomayor pointed out in a opinion conceded that there's really no structural fundamental difference between the drug forfeiture statute in Title 21 and the statute at issue here. Some courts have found that because there is some difference in language and made distinctions, while I might think that's some good reasoning by those courts, I am not at liberty to make those arguments as the United States has conceded that. I think that issue needs to go back. Your position is that of the Solicitor General? Yes, sir. I might get in trouble if it was something else. Good idea. Thank you, Your Honors. Thank you, Mr. Watkins. Good to have you again. Always good to be here, sir. Good to see you. Ms. Harrell? So, the government takes the position that Stinson has not been overruled and that Campbell has not decided what analysis this court should apply in this case. Can I ask you a question? Can you tell me why it matters for purposes of your argument whether we're understanding under Stinson or under Kaiser? I am strongly inclined to agree. Campbell resolved this. It was first. We're under Kaiser. But I'm not sure, I mean even under Stinson we're not supposed to defer to commentary that does more or something different than actually interpret the guideline. Do you feel like maybe you win under Kaiser but lose under Stinson? Yes and no. It matters significantly in Ms. Limbaugh's case because of the calculation of the intended loss. The actual loss in her case was around $48,000. The intended loss jacks her up to $248,000. I certainly understand why it matters whether you consider intended loss. Correct. And so the $500 per access device falls into that argument as $50,000. So that leaves $190 some odd thousand dollars that would not have been calculated and would not have impacted her up to her guideline range. Is your position that the intended loss guideline is valid under Stinson but invalid under Kaiser? That's what I'm trying to get at. Does it matter whether we're looking at this under Stinson or under Kaiser? If you have to look at it under Stinson I believe that she would not prevail. If you apply the analysis under Kaiser I do believe she would prevail because the term loss in the guideline itself is not ambiguous. And so therefore you don't resort to the commentary to define it as intended loss or the $500 per access device. So it makes a very big deal to her. I'm not as sure as you are that it's fine under Stinson, but that's okay. I did not present that argument and I would certainly believe that Talk some other time. Right. I also if you look at it doesn't specifically talk about how it got to the $500 per access device but I did talk a little bit about the history of upping from $100 to $500 I think it's on page 26 of my brief that talks a little bit about how Congress did that. The government has acknowledged before this court in its response to Moses's petition for rehearing that Campbell controls an analysis. That Campbell is the controlling case instead of Moses as far as analysis of the guidelines. Their response to Moses's petition for rehearing at pages 10 and 11 so and they have taken the same position in front of the United States Supreme Court in a brief in opposition to certiorari and tab versus United States. So while I tread lightly I do believe that they have already taken the position that Kisor analysis is more appropriate for consideration of whether a term in the guidelines is genuinely ambiguous and I think if you walk through the steps of text, structure, history, purpose you'll find that the term loss in the guideline itself is not genuinely ambiguous so that you don't defer down to the definitions in the commentary to include intended loss and the $500 per access device. Thank you, your honors. Thank you very much Ms. Harrell. We appreciate the presentations of counsel We'll take the case under advisement.
judges: Robert B. King, Pamela A. Harris, Michael Stefan Nachmanoff